# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*People v. Alicea*, 2013 IL App (1st) 112602

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JESUS ALICEA, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-11-2602 |
| Filed<br>Rehearing denied | October 30, 2013<br>December 10, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for unlawful possession of a weapon by a felon was reversed and the related fines and fees were vacated on the ground that the State failed to establish beyond a reasonable doubt that defendant was in constructive possession of the weapons and ammunition found in the bedroom of an apartment, since there was evidence that defendant's daughter, two sons, and a grandchild resided in the apartment, but evidence that defendant lived there was lacking. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-15160; the Hon. Catherine M. Haberkorn, Judge, presiding. |
| Judgment | Reversed; fines and fees order vacated. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, Scott F. Main, and Melinda Grace Palacio, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Margaret M. Smith, and Sonia A. Antolec, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE MASON delivered the judgment of the court, with opinion.
Presiding Justice Hyman and Justice Palmer concurred in the judgment and opinion.

## OPINION

¶ 1    Following a bench trial, defendant Jesus Alicea was found guilty of two counts of unlawful possession of a weapon by a felon and sentenced to concurrent terms of five years' imprisonment. On appeal, Alicea challenges the sufficiency of the evidence to sustain his convictions and the propriety of two fees imposed by the circuit court.

¶ 2    The evidence adduced at trial showed that on June 2, 2010, Chicago police officer Anthony Varchetto and a confidential informant appeared before a circuit court judge requesting a search warrant for the first-floor apartment at 3036 North Knox Avenue. Officer Varchetto alleged that the informant told him that on June 1, 2010, he purchased two bags of heroin from a man known as "Choco" inside the apartment, and there observed a large amount of heroin inside a can in the pantry. The informant had purchased heroin from Choco for two years and had been inside the apartment over 50 times. He described Choco as a black Hispanic male, approximately 5 feet 8 inches tall, weighing 140 pounds, and 45 years of age.[1]

¶ 3    A warrant issued, and a search was conducted about an hour later by a Chicago police department tactical team. At approximately 11:20 p.m., the officers knocked on the apartment door and announced their office, and when they received no response, made a forced entry. The apartment had a living room, dining room, kitchen, and two bedrooms, one of which was in the front of the apartment, and the other in the rear. Multiple photographs of these rooms, depicting their condition and contents, were taken after the search and entered into evidence by the State at trial.

---

[1]"Choco" was not a nickname listed for Alicea in the computerized printout of his criminal history maintained by the Chicago police department.

¶ 4    As the officers entered, two pit bull terriers approached aggressively. Christopher Blanchard, who appeared to be in his early twenties and who later identified himself as Alicea's son, walked out of the rear bedroom with a young child. The officers directed him to control the dogs, and he took them out to the back porch. An officer then patted him down, but did not recover any contraband from his person.

¶ 5    Officer Anthony Jannotta searched the kitchen pantry and recovered several plastic bags containing suspected narcotics, two electronic scales, and a mixer. The narcotics were inventoried according to proper procedure, and the parties stipulated that multiple bags contained substances that tested positive for cocaine and heroin.

¶ 6    Officer Jeff Salvetti testified that he and Officer Erick Seng searched the front bedroom and observed a mattress, an armoire and a small dresser. They recovered a .44 Magnum handgun containing six live rounds from under the mattress. Officer Seng left the bedroom to clear the weapon, and other officers came in to assist with the search. In the armoire and underneath men's clothing, Officer Salvetti recovered two 9-millimeter handguns, which were loaded with seven and five live rounds, respectively. Officer Miehle found a bag containing various calibers of ammunition on a shelf in the armoire. Officer DeMarco discovered $635 in currency in the small dresser, and Officer Valentin found $790 in the closet. Officer Varchetto then found an envelope containing a United States Treasury check inside the small dresser. The check was addressed to Alicea at the apartment being searched, and the envelope showed a delivery date of June 1, 2010, the day before the search took place. The officers did not see any children's toys, clothes, or other items in the front bedroom.

¶ 7    The officers then searched the rear bedroom, where they observed various baby items, including toys, bottles and diapers. When asked if there was a bed in that bedroom, Officer Varchetto testified, "Not a big bed, no." A photograph of the back bedroom taken after the search warrant was executed shows a portion of a box spring leaning up against a wall. It is not possible to see in the photo if there is a mattress behind the box spring. The officers did not recover any guns, ammunition, currency or other contraband from the rear bedroom.

¶ 8    Photographs of the apartment taken in what appear to be the living and dining rooms show a large amount of children's equipment and toys. They also show a filing cabinet, two computer desks, and another dresser. No evidence regarding the contents of the filing cabinet or dresser or items on the computer desks were introduced at trial. The only item of mail addressed to Alicea at the Knox address introduced into evidence was the United States Treasury check found in the front bedroom.

¶ 9    Sergeant Eric Winstrom and Officer Varchetto then spoke with Blanchard, who told them that he was there with his child "to visit *** the child's grandfather." He explained that he was recently released from jail and was staying at the apartment for a few days until he found another place to live. Sergeant Winstrom asked Blanchard if he knew where Alicea was or if he had his contact information. Blanchard gave the officer Alicea's cell phone number. The officer called the number, spoke to someone who identified himself as Alicea, and told him that he was going to be arrested and should turn himself in. The speaker agreed to do so the next day. Alicea, however, did not turn himself in, and an investigative alert was issued for

his arrest.

¶ 10    For the next two days, Officers Varchetto and DeMarco conducted a surveillance of the apartment. On both days, they observed several people remove various personal items and furniture from the apartment and load them into a moving truck.

¶ 11    On July 21, 2010, Officers Varchetto and DeMarco observed Alicea in the vicinity of the 1300 block of Kostner, which is not in the same neighborhood as the Knox apartment. Upon noticing the officers, Alicea fled in a vehicle bearing stolen temporary license plates. He then abandoned the vehicle and fled on foot. The officers apprehended Alicea shortly thereafter and placed him under arrest.

¶ 12    The State entered a certified copy of Alicea's driver's license abstract, which listed his address as 3036 North Knox. The abstract also reflected that a license listing 3036 North Knox as the address for Alicea had been issued on April 2, 2010, two months prior to the execution of the search warrant. The parties then stipulated to Alicea's prior felony conviction, the State rested, and the court denied Alicea's motion for a directed finding.

¶ 13    The defense called Alicea's daughter, Anais Alicea, who testified that she moved into 3036 North Knox with her father in 2007. She related that Alicea worked as a mechanic and that they were in business together, buying, fixing, and selling used cars that they kept on the street near the apartment. She testified that she slept in the rear bedroom and that her two-year-old daughter lived with her, but, on the advice of counsel, she refused to answer a question as to which bedroom Blanchard slept in on the grounds that it could incriminate her.[2] She further testified that her brother Michael moved into the apartment in January 2009, and Blanchard moved into the apartment in June 2009. On the day the apartment was searched, she, her daughter, and her two brothers were living at the apartment. She was not home at that time, but "got there right after," and learned that the apartment had been searched when she "drove over there" and saw the police outside.

¶ 14    Anais testified that her father moved from 3036 North Knox to his fiancée's home in January 2010, but that his mail still came to the apartment. When his monthly check from the Veteran's Administration arrived, she would take it to him for his signature and deposit it. On the day of the search, she had called Alicea to tell him that his check had been delivered and that she would bring it to him the next day. She testified that she left the check "on my dresser."

¶ 15    Yenet Morales testified that she had known Alicea for over 20 years and that they started dating in 2007. He began staying at her condominium in Elmwood Park frequently when Michael moved into 3036 North Knox in January 2009, because Alicea could not stay in the same household as Michael, who "had a case" pending in court. In January 2010, Alicea and Morales became engaged, and he "completely" moved into her home. Morales testified that the apartment was then occupied by Blanchard, Michael, Anais and Anais's daughter.

_____

[2]When the trial judge became aware that Anais intended to testify that she lived in the apartment where the drugs and weapons were found, the court insisted that a public defender be appointed to represent her during her testimony. After consulting with the lawyer appointed for her, Anais invoked her fifth amendment privilege.

Blanchard's child would stay in the apartment every other weekend. She also testified that Alicea sold cars and did "mechanic work," and he would keep the cars across the street from the 3036 North Knox apartment. Morales's condominium only had one assigned parking space and there was insufficient street parking to leave cars on the street.

¶ 16 At the close of evidence and argument, the court found Alicea guilty of two counts of unlawful possession of a weapon by a felon. In the course of its ruling, the court stated that, based on the photographs introduced, it did not believe that three adults and sometimes two children lived at the apartment. The court observed that the apartment was in "horrendous condition," and that "[t]here is one mattress. There is no place for a child to sleep. There are a couple of children's toys." The court then concluded, "[t]here's no way that I believe that all these people were living in this place. I believe the defendant was living in this residence."

¶ 17 The court also observed that the driver's license abstract indicated that just two months prior to the search, Alicea applied for a license using the 3036 North Knox address. It further noted that the United States Treasury check was found in the bedroom with the guns and concluded, "I believe that the defendant did live in that room, that proof of residency *** was found in that room and that the weapons were found in that room."

¶ 18 The court, however, found Alicea not guilty of the remaining two counts of possession of a controlled substance, observing that the narcotics were recovered in an area where others had access and control.

¶ 19 Alicea moved to reopen the proofs based on a photograph taken after the search depicting three toothbrushes and a woman's sanitary product in the bathroom of the apartment. Alicea argued that the photo showed that at least three adults, including a woman, resided at the apartment. The State did not object to Alicea's motion, but argued that the photo did not affect the court's previous judgment. The court allowed the photo into evidence, and Alicea moved for a new trial. The court, however, found no basis to reverse its prior judgment, commenting that one person could have three toothbrushes, and concluding that the photo did not "prove anything different to me than what I have already decided on the previous ruling."

¶ 20 The court also noted another reason for its judgment. It observed that when Anais testified about going to the apartment after it was searched, she explained that she went "there." The court observed that the word "there" was a peculiar way to describe one's own home, noting that when someone goes to his or her own home, he or she would generally describe it as going to "my house," and when someone goes to another person's house, he or she would describe it as going "there." The court observed that Anais's choice of wording "corroborate[d] the fact that I don't believe the story that she gave and the testimony." The court then denied Alicea's motion for a new trial and subsequently sentenced Alicea to two concurrent sentences of five years' imprisonment.

¶ 21 On appeal, Alicea first challenges the sufficiency of the evidence to sustain his convictions. He contends that the State failed to meet its burden of proving that he knowingly possessed the guns and ammunition recovered from the apartment. He claims that the evidence showed that he did not have exclusive access to the home and that the trial court

noted this in finding Alicea not guilty of the narcotics charges. He states that "[a]t best, the State's evidence in this case established that [defendant] still shared a living space with his family at 3036 N. Knox."

¶ 22    When a defendant challenges the sufficiency of the evidence in a criminal case, the standard of review is whether, after viewing the evidence in the light most favorable to the prosecution and allowing all reasonable inferences from that evidence to be drawn in its favor, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Martin*, 2011 IL 109102, ¶ 15; *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This court may not substitute its judgment for that of the trier of fact as to the weight of the evidence or the credibility of the witnesses and will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of defendant's guilt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009).

¶ 23    To sustain defendant's convictions for unlawful possession of a weapon by a felon in this case, the State was required to prove that he had knowing possession of the weapons and that he had a prior felony conviction. *People v. Rasmussen*, 233 Ill. App. 3d 352, 370 (1992). Alicea does not challenge the sufficiency of the evidence to establish his prior felony conviction, leaving only the issue of whether the evidence was sufficient to establish his knowing possession of the weapons. *Rasmussen*, 233 Ill. App. 3d at 370.

¶ 24    Possession of a weapon may be actual or constructive (*People v. Spencer*, 2012 IL App (1st) 102094 ¶ 17), and where, as here, Alicea was not found in actual possession, the State must prove constructive possession, *i.e.*, that defendant had knowledge of the presence of the weapons, and that he had immediate and exclusive control over the area where they were found *People v. Hunter*, 2013 IL 114100, ¶ 19; *Spencer*, 2012 IL App (1st) 102094, ¶ 17. Evidence of constructive possession is "often entirely circumstantial." *People v. McLaurin*, 331 Ill. App. 3d 498, 502 (2002). A trier of fact is entitled to rely on an inference of knowledge and possession sufficient to sustain a conviction "absent other factors that might create a reasonable doubt as to the defendant's guilt." *People v. McCarter*, 339 Ill. App. 3d 876, 879 (2003).

¶ 25    In *McCarter*, defendant was found to be in constructive possession of the bedroom in his parents' house where weapons were found even though defendant was not home at the time of the search. The weapons were found in and on a dresser where photographs of defendant and mail addressed to him were located. The postmark on one of the pieces of mail was four days prior to the search. One of the officers involved knew defendant lived at the address based on previous encounters with him and defendant's prior statements indicating that he lived there. Finally, defendant's mother told the officers that defendant had been at the house earlier, but had left. *Id.*

¶ 26    In contrast, in *People v. Ray*, 232 Ill. App. 3d 459 (1992), the court characterized as "scant" evidence showing that when officers entered an apartment, the three defendants were sitting on a sofa 18 inches away from a table on which a handgun, currency, and drugs were located. A cable television bill dated six months earlier and addressed to one of the defendants at the apartment was located on top of a television set in the same room. Each of the defendants gave a different address as his residence on the arrest reports. Finding that the

State failed to present evidence that tended to show that defendants owned, rented or lived in the apartment, their convictions were reversed. *Id.* at 462-63.

¶ 27 This case falls somewhere between *McCarter* and *Ray*. The evidence of Alicea's constructive possession of the weapons and ammunition found in the front bedroom is neither as strong as the evidence in *McCarter* nor as scant as that in *Ray*. The evidence at trial showed that, in executing the search warrant, officers talked to Blanchard, who told them that he and his child were staying at the apartment for a few days to "visit *** the child's grandfather." This differs from Anais's testimony, confirmed by Morales, that Blanchard had resided with her in the apartment since June 2009. However, if as the officers stated, Blanchard also told them he had recently been released from prison, it stands to reason that he would not want to admit to police that he was a long-time resident of an apartment (and, according to Morales, an occupant of the bedroom) where weapons and ammunition had just been recovered, not to mention the drugs found in the pantry.

¶ 28 During the search of the front bedroom, the officers recovered two guns and ammunition from underneath men's clothes in an armoire, and another underneath a mattress. In the same bedroom, officers recovered an envelope and a United States Treasury check addressed to Alicea at the Knox address dated the day prior to the search. There was also evidence that Alicea used the Knox address two months earlier when he applied for his driver's license and that he ran a business with cars on the street outside the apartment. While these facts certainly support the inference that Alicea lived in the apartment, they are not sufficient in the face of other evidence to sustain the State's burden to prove beyond a reasonable doubt Alicea's possession and control of the bedroom.

¶ 29 When the police forced entry to the apartment at 11:20 p.m. on June 2, 2010, Blanchard exited the rear bedroom carrying a young child. It is entirely reasonable to assume that he was sleeping in that room. This is particularly true given the photograph of the room taken after the search partially showing a box spring propped against the wall. Officer Varchetto did not testify that there was no bed in the back bedroom, only that there was no "big bed."

¶ 30 In announcing its decision, the court found it unbelievable that all the people described by the defense witnesses were living in the apartment but, rather, believed that this was Alicea's residence. Although the court found incredible the testimony of Anais and Morales regarding the number of residents in the apartment and found "confusing" Morales's testimony regarding when Alicea resided with her, the court's characterization is not borne out by our review of the record. The court's reasoning does not address why Anais and Morales would testify, for example, that Alicea's son, Michael, was living in the apartment if that meant there were too many adults for the number of bedrooms. After all, Michael was not present at the time of the search and the police would have no reason to suspect that he lived there if Anais and Morales did not mention him. The photograph of the bathroom introduced on Alicea's motion to reopen the proofs clearly shows three adult-sized toothbrushes in the bathroom and a woman's sanitary product, which tends to corroborate Anais's and Morales's testimony. The single reference by Anais to the apartment as "over there" does not, in our view, tip the scale in the State's favor. Finally, we do not find confusing Morales's testimony that Alicea began staying with her on a regular basis in 2009 and later, in January 2010, began living with her full time.

¶ 31        While the United States Treasury check dated the day before the search and located in the dresser in the front bedroom supports the inference that Alicea resided at the apartment, it is puzzling that given the number of other places documents reflecting Alicea's residency could be located, including the file cabinet, dresser and computer desks in the living and dining rooms, not one other bill or piece of mail addressed to Alicea was found. It is not inherently incredible that Alicea would continue to have a government check sent to the Knox address if, as Anais testified, she would take care of getting his endorsement and depositing the check for him.

¶ 32        Further, the fact that Alicea had his driver's license reissued in April listing the Knox address is not determinative. Morales testified that for seven years prior to 2010 she had owned the condominium where she resided with Alicea. Therefore, it would be reasonable to assume that any mortgage, utility, and insurance bills relating to that property were in her name. Therefore, even if Alicea wanted to obtain a driver's license with the Elmwood Park address on it, it is unlikely that he would have any proof to show the Secretary of State that he lived there. Furthermore, although Morales and Alicea were, according to Morales, engaged, they were not married and Alicea may not have considered Morales's Elmwood Park condominium a permanent address.

¶ 33        Given the lack of any other evidence that Alicea resided at 3036 North Knox, we find that the State failed to prove beyond a reasonable doubt that Alicea was in constructive possession of the weapons and ammunition found in the bedroom.

¶ 34        For the foregoing reasons, we reverse Alicea's convictions for unlawful possession of a weapon by a felon.

¶ 35        Given the reversal of Alicea's conviction, the order imposing related fines and fees is vacated.

¶ 36        Reversed; fines and fees order vacated.